**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Residential Funding Company, LLC,                    Civil No. 09-3455 (SRN/AJB)
Limited Liability Company,

                    Plaintiff,                    **MEMORANDUM OPINION**
                                                  **AND ORDER**

         v.

Terrace Mortgage Company,
a Georgia corporation,

                    Defendant.

---

Donald G. Heeman, and Jon L. Farnsworth, Felhaber, Larson, Fenlon & Vogt, P.A., 220 South Sixth Street, Suite 2200, Minneapolis, MN 55402, for Plaintiff.

Thomas M. Barton and Aaron P.M. Tady, Coles Barton LLP, 9 Lumpkin Street, Suite 200, Lawrenceville, GA 30046; and John D. Sear and Melissa Stull, Bowman and Brooke LLP, 150 South Fifth Street, Suite 3000, Minneapolis, MN 55402, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

         This matter is before the court on the motion for summary judgment by Plaintiff

Residential Funding Company, LLC ("Residential" or "RFC") (Doc. No. 22). For the

reasons stated below, this Court grants the motion.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

         On May 18, 1994, Residential entered into a "Seller/Servicer Contract" with

Defendant Terrace Mortgage Company to purchase residential mortgage loans

underwritten by Terrace on the condition that those loans met certain specified

requirements. (Doc. No. 1, Ex. A., at 8.) Terrace concedes it was its responsibility to

underwrite the loans "consistent with any conditions" placed on that loan by RFC. (Doc.

No. 28, Ex. 1, at 43, 144.)  The Contract expressly incorporated "the Residential Funding

Seller and Servicer Guides" that Residential published and amended from time to time

(collectively, the "agreement").  (<u>Id.</u>)  Terrace, as "the 'Seller/Servicer,'" acknowledged

"that it has received and read the Guides."  (<u>Id.</u>)  The Contract provided that "[a]ll

provisions of the Guides are incorporated" into the agreement.  (<u>Id.</u>)  It further provided

that it "may not be amended or modified orally, and no provision of [it] may be waived or

amended except in writing," but that "the Guides may be amended or supplemented by

Residential Funding from time to time."  (<u>Id.</u>)

The Contract also included specified representations and warranties, including that

"the Seller/Servicer makes the representations, warranties and covenants set forth in the

Guides."  (<u>Id.</u>)  Finally, the agreement provided that "[i]f an Event of Seller Default or an

Event of Servicer Default shall occur, Residential Funding may, at its option, exercise one

or more of those remedies set forth in the Guides," including, as relevant here, a demand

that Terrace repurchase a loan or otherwise make Residential whole.  <u>Id.</u>

As contemplated by the agreement, Residential amended and supplemented the

Guides during the relevant time-frame.  It appears that four versions of the Guides are

implicated here:  (1) Version 1-05-G03, dated July 22, 2005; (2) Version 1-06-G01, dated

March 13, 2006; (3) Version 1-06-G02, dated June 12, 2006; and (4) Version 1-06-G04,

dated December 11, 2006.  But for present purposes, it appears that none of the variations

is relevant here.[1]

---

[1]        Terrace describes the Guides as "constantly changing" (Doc. No. 34, at 2),
continue...

The parties engaged in a successful ongoing business relationship involving a substantial volume of loans for several years before the events in question here took place.  (Doc. No. 28, Ex. 1, at 109.)  Initially, when Residential notified Terrace that a particular loan needed to be repurchased by Terrace, the parties generally worked out the issue without strict adherence to the terms of the agreement, much less recourse to litigation.  As the real estate market began to sour, however, Residential required repurchase of an increasing number of loans and the parties were unable to work out Residential's objections to the loans at issue here.  Sometime before February 14, 2008, Residential terminated its business relationship with Terrace.  (Doc. No. 28, Ex. 1, at 93.)

Residential filed this action in December 2009, alleging that Terrace was obligated, but refused, to repurchase thirteen loans Residential had purchased from Terrace.[2]  Residential's Complaint asserted two counts:  (1) one claim for breach of contract, and (2) one claim for indemnity for Residential's attorneys' fees, costs and disbursements pursuant to the parties' agreement.  (Doc. No. 1-1.)  Residential now moves for summary judgment on both counts.

---

[1]...continue
but it appears that they changed at most quarterly and, more importantly, none of the provisions at issue here changed in any material way over the relevant time period.

[2]     Residential originally had alleged that Terrace was obligated to repurchase five additional loans, but the parties later agreed to a dismissal of Residential's claims with respect to those five loans.  (Doc. Nos. 17, 18.)  The parties also agreed to the dismissal of Terrace's four counterclaims that it had asserted in its Answer.  (Id.)  Terrace's Answer also included eight specified "affirmative and other defenses" including failure to mitigate damages, waiver and estoppel, failure of consideration, and prior material breach.  (Doc. No. 4, ¶¶ 24-32.)  Three of the eight are expressly identified as *affirmative* defenses by Rule 8.  Fed. R. Civ. P. 8(c).

## II.     DISCUSSION

### A.     Summary Judgment Standard

The movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a mater of law." Fed. R. Civ. P. 56(a).  Here, Plaintiff seeks summary judgment on its own claims. Accordingly, Terrace, as the non-movant, is entitled to any factual inferences being drawn in its favor, at least with respect to the elements of Residential's claims for breach of contact and indemnification.   And Residential, as the party seeking summary judgment on its own claims, bears the burden of proof on those claims.

But Terrace's opposition is not confined to just the argument that Residential has failed to prove the elements of its claims.  As noted above, Terrace's Answer included several "affirmative and other defenses."  (Doc. No. 4, ¶¶ 24-32.)  Terrace, however, has not moved for summary judgment, based either on any of its affirmative defenses or otherwise.  And, of course, Terrace bears the burden of proof with respect to any affirmative defense.  Lackawanna Chapter of the Ry. & Locomotive Hist. Soc'y, Inc., v. St. Louis County, Missouri, 606 F.3d 886, 888 (8th Cir. 2010) (affirmative defense of statute of limitations); Fields Eng'g & Equip., Inc. v. Cargill, Inc., 651 F.2d 589, 593 (8th Cir. 1981) (affirmative defense of waiver).  Yet in opposing Residential's motion for summary judgment, Terrace argues that Residential "must demonstrate that, as a matter of law, Terrace cannot prove its defenses at trial."  (Doc. No. 34, at 2.)  Terrace contends that many of Residential's individual claims are "subject to defenses that RFC has not

demonstrated will fail, as a matter of law, at trial." (Id. at 5.)  Furthermore, Terrace

claims that all of the "factual issues must be construed against RFC as the movant on

summary judgment." (Doc. No. 42, at 8.)

With respect to its affirmative defenses, Terrace thus improperly attempts to shift

the burden to Residential.  "A party resisting summary judgment cannot expect to rely on

the bare assertions or mere cataloguing of affirmative defenses." Harper v. Delaware

Valley Broadcasters, Inc., 743 F. Supp. 1076, 1090 (D. Del. 1990), aff'd, 932 F.2d 959

(3d Cir. 1991) (table).  Where the non-movant has alleged affirmative defenses but has

not based any summary-judgment motion of its own on such defenses, it nevertheless

must still "come forward with evidence to support [its] affirmative defenses" in its

opposition to the movant's motion.  Id. at 1090-91.  In such a situation, it is "incumbent"

upon the non-moving defendant "to respond by, at the very least, raising in their

opposition papers any and all arguments or defenses [it believes] precluded judgment in

Plaintiffs' favor." Johnson v. Bd. of Regents of the Univ. Of Georgia, 263 F.3d 1234,

1264 (11th Cir. 2001).  The mere fact that a defendant has alleged affirmative defenses in

its answer is not enough to preclude a plaintiff's motion for summary judgment.  Frankel

v. ICD Holdings S.A., 930 F. Supp. 54, 64 (S.D.N.Y. 1996).

Rather, "one who relies upon an affirmative defense to defeat an otherwise

meritorious motion for summary judgment must adduce evidence which, viewed in the

light most favorable to and drawing all reasonable inferences in favor of the non-moving

party, would permit judgment for the non-moving party on the basis of that defense." Id.

at 65.  Where, as here, the plaintiff moves for summary judgment on liability, "the non-

movant is thereby placed on notice that *all* arguments and evidence opposing a finding of

liability must be presented to properly resolve that issue."  The Pantry, Inc. v. Stop-N-Go

Foods, Inc., 796 F. Supp. 2d 1164, 1167 (S.D. Ind. 1992) (emphasis in original).  "A

summary judgment on the issue of liability encompasses all affirmative defenses and

implicitly challenges the non-movant to establish a basis for finding that the defenses are

both applicable and supported by sufficient facts."  Id.  Because the moving plaintiff need

not disprove the non-movant's affirmative defenses, the "defendant must *support* its

affirmative defenses in the response to a plaintiff's motion for summary judgment."  Id.

(emphasis in original).

Of the eight "affirmative and other" defenses Terrace raised in its Answer, it now

pursues only four:  (1) failure to mitigate damages, (2) lack of consideration, (3) the prior

breach doctrine, and (4) waiver and estoppel.  With respect to its defenses of waiver and

estoppel, Terrace asserts that "[t]here are issues of material fact for a jury to decide."

(Doc. No. 42, at 5.)  But "[t]he requirements of pointing to specific contested facts in

opposing a motion for summary judgment are particularly elevated where the nonmoving

party would bear the burden of proof at trial on the affirmative defense of waiver."

Security Pacific Mortgage and Real Estate Services, Inc. v. Canadian Land Co. Of

America, 690 F. Supp. 1214, 1219 (S.D.N.Y. 1988), aff'd, 891 F.2d 447 (2d Cir. 1989).

### B.    Breach of Contract Claim

Residential identifies various types of contractual breaches for the thirteen loans at

issue and delineates its damages with respect to each.  In support of its motion,

Residential provides the various contractual materials, deposition transcripts and

correspondence between the parties regarding the individual loans.

Terrace, however, does not contest that certain types of borrower

misrepresentations or appraisal errors would not constitute a breach of the agreement–an

"event of default" in the terms of the agreement.  And with respect to damages, Terrace

does not proffer any alternative figures, or calculations.  Rather, Terrace premises its

opposition with respect to liability largely on the admissibility of the evidence on which

Residential relies, frequently challenging that evidence as inadmissible hearsay.  And

with respect to damages, Terrace also rests on the argument that Residential's case is

based entirely on hearsay.

### 1.      Liability

Terrace first takes issue with Residential's view of the contractual terms for

underwriting loans and repurchasing non-conforming loans.  Terrace argues that (1)

Residential has no unilateral right to require Terrace to repurchase loans, and (2) if such

right does validly exist, the agreement is unenforceable for lack of consideration.   (Doc.

No. 42, at 2-4.)  Terrace further claims that the non-waiver provision does not preclude an

argument that Residential waived its right to enforce its repurchase remedy.  (Id. at 4-5

(yet contending that it "is not claiming that, by simply delaying, RFC has waived its

claims," but that "RFC's delay and failure to take appropriate actions has harmed Terrace

by decreasing the value of the loans" at issue) (emphasis in original).)

Residential observes that courts will not rewrite unambiguous contract language, which it asserts here provided that "RFC had the exclusive discretion to determine if an Event of Default occurred." (Doc. No. 38, at 2, 7.) Under the terms that Terrace agreed to, Terrace was obligated "to repurchase or make RFC whole on a loan with 30 days of RFC's demand, unless Terrace appealed in writing" and prevailed, and even then RFC had the authority under the agreement to determine "in its sole discretion whether the appeal was meritorious." (Id. at 7.)

As discussed above, Terrace expressly acknowledged in the "Seller/Servicer Contract" that it had received and read the Guides, which were incorporated into the parties' agreement. That Contract also provided that Residential "may, at its option, exercise [any of the] remedies set forth in the Guides" if "an Event of . . . Default shall occur." (Doc. No. 1, Ex. A, at 9.) The Client Guides delineate six particular events of default, including the following:

(1) that Terrace "has not complied with one or more of the requirements . . . terms or conditions outlined" in the Client Guide;

(2) that Terrace "has breached any agreement" between it and RFC;

(3) that Terrace "has breached any of the representations, warranties or covenants set forth in [the] Client Guide, fails to perform its obligations under [the] Client Guide or the Program Documents, makes one or more misleading representations, warranties or covenants to [RFC], or [h]as failed to provide [RFC] with information that is true, complete and accurate;" or

(4) that the "Borrower or any other person or entity involved in the loan transaction or in its underwriting or documentation (including any appraiser . . .) has made any false representation and /or has failed to provide information that is true, complete and accurate in connection with such

transaction, whether or not [Terrace] was a party to or had knowledge of
such misrepresentation or incorrect information."

(Doc. No. 29, Ex. 6, § A208, at 6312.)  Here, the alleged events of default include

misrepresentations by the borrowers (regarding income, debt, and use of the property as

primary residence) and excessive appraisals.

The relevant Client Guides uniformly provide that if Residential "determines that

an **<u>Event of Default</u>** has occurred with respect to a specific Loan, [Terrace] agrees to

repurchase the Loan and its servicing."  (<u>E.g.</u>, Doc. No. 29, Ex. 6, § A210(A), at RFC

06314 (emphases in original).)  In other words, Residential had the exclusive authority to

determine if a default occurred.  The Guides confirmed that Residential had the *sole*

discretion to make such determinations.  "Whenever any provision of this Client Guide

contract requires [Residential] to make a determination of fact or a decision to act, or to

permit, approve or deny another party's action[,] such determination or decision shall be

made in [Residential's] *sole and absolute discretion*."  (<u>Id.</u> § 113(B), at RFC 06279

(emphasis added).)[3]

The Guides also provide Terrace with the right to appeal Residential's demand for

the repurchase of loans.  "The Client may appeal [Residential's] decision by providing

any additional information or documentation."  (<u>Id.</u> § A210(H).)  They also provide that

Residential "will in *its sole discretion* determine the validity of any appeal filed by the

---

[3]       The other three versions of the Guide at issue provide that Residential's
determination or decision shall be made in its "sole discretion."  (Doc. No. 28, Ex. 10, §
113(B), at RFC 07558; Doc. No. 29, Ex. 1, § 113(B), at RFC 09494; <u>id.</u>, Ex. 5, § 113(B),
at RFC 08206).  In the present circumstances, this slight variation is without legal effect.

Client.  If [Residential's] decision remains firm following an appeal, the Client shall

repurchase the Loan and its servicing."  (Id. § A210(H) (emphasis added).)[4]

Terrace argues that the Guides do "not state that, if Terrace does not appeal

[Residential's] determination that a default has occurred, Terrace cannot later dispute

RFC's claim in a court of law," because "the option to appeal is permissive."  (Doc. No.

42, at 2-3 (emphasis in original).)  But the permissive nature of the contractual appeal

right says nothing, one way or the other, about any right or ability of Terrace to challenge

---

[4]    Terrace argues that the agreement, if construed to permit RFC to require
repurchase of loans based on its own determination, is not enforceable because it lacked
consideration.  (Doc. No. 42, at 3.)  But the Court may construe the agreement only
according to its own plain terms, which indisputably authorize RFC to determine, in its
sole discretion, whether a loan failed to meet its requirements.  And the consideration
necessary to support the agreement is that RFC paid Terrace a premium for loans in
exchange for Terrace underwriting loans that met RFC's stated requirements.  The fact
that the agreement provided Residential with such rights does not thereby render the
contract unenforceable.  Terrace relies on Softchoice, Inc. v. Schmidt, 763 N.W.2d 660
(Minn. App. 2009).  But in Softchoice, which applied Missouri law, the court ruled that
an employee benefit plan, under which the employee could receive monetary retention
credits contingent on certain events, was not sufficient consideration for a separate, stand-
alone non-compete agreement that the employer required the employee to sign in order to
participate in the retention plan because the employee had not, and would not, receive any
credits under the retention plan as those credits were awarded solely in the employer's
discretion.  Id. at 663-64, 666-67.  Here, in contrast, there is a single agreement, which is
governed by Minnesota law and does not involve any disfavored restraint-of-trade
provision.  Moreover, under the agreement here, Residential paid Terrace a premium for
loans that met Residential's criteria.  That the agreement provided Residential with the
sole right to determine whether those criteria had been satisfied does not render the
agreement unenforceable for lack of consideration.  And any determination by Residential
that a loan did not conform required Terrace to repurchase the loan simply rescinds that
transaction, returning both parties to the position they occupied before the original
purchase.

Residential's repurchase determinations in a legal action.[5]  The fact that Terrace had the

option to appeal any initial determination by Residential of a default does not diminish,

much less undermine, Residential's contracted-for exclusive right to determine if a

default had occurred.[6]

Terrace argues that "[a]llowing RFC to recover simply because it demanded

repurchase would effectively allow RFC to force Terrace to take back any and every loan

that Terrace ever sold to RFC, at RFC's whim.  RFC could require a repurchase of any

loan, whether there was a default or not, regardless of its motives."  (Doc. No. 42, at 3.)

But at issue here are only thirteen of the hundreds of loans that Residential purchased

_____

[5]      Terrace argues that exercising its right of appeal "was futile" because
Residential denied the repurchase demands that Terrace had appealed with respect to five
of the loans at issue.  (Doc. No. 42, at 3.)  But Terrace premises this argument solely on
its contention that "RFC denied Terrace's appeal of the Wilson loan, even though
internally RFC believed that Terrace's appeal had merit."  (Id.)  Terrace has not
established that the appeal denials were wholly unfounded. And the evidence on which
Terrace relies, a single internal e-mail, does not establish futility, only some disagreement
within RFC regarding Terrace's position on the Wilson appeal.  (Doc. No. 35, Ex. 3, at
RFC04958 (reflecting, at most, that one Residential employee thought that Terrace "has a
point" regarding Wilson's income).)

[6]      Terrace relies on Continental Grain Co. v. Febles Constr. Co., 480 F.2d 793
(8th Cir. 1973), to support its argument that "such a limitation of remedy must be
expressly and clearly stated."  (Doc. No. 42, at 3.)  But in Continental Grain, a contract
that required a construction company to design and build a structure, provided that the
construction company would guarantee all materials and workmanship, did not constitute
an exclusive remedy because it did not limit the company's "liability for its negligence,
but rather entitles [the other party] to demand corrective action to remedy defects without
first showing fault by law attributable to" the construction company. Id. at 796.  Another
provision provided that payment to the construction company neither relieved it from its
obligation or liability to replace any work that was later discovered to be faulty nor
operated as a waiver.  Id.  And here, it is indisputably clear that Residential had the right,
in its sole discretion, to determine whether the loans met its requirements.

from Terrace.  And the plain meaning of the agreement allows for Residential's right to demand that Terrace repurchase loans that Residential, in its sole determination, has concluded are non-conforming.  Insofar as its objection to the repurchase provisions is that there is no mechanism for judicial review of Residential's determination that Terrace must repurchase a loan, a party to a contract is free to expressly provide for a forum for judicial review or to relinquish any right of action in the courts, as is evident by the validity of arbitration agreements.

As noted above, Terrace further claims that the non-waiver provision does not foreclose its argument that Residential waived its right to enforce its repurchase remedy. (Doc. No. 42, at 4-5.)  The Client Guides (uniformly) include several non-waiver provisions regarding Residential's contractual right to demand and obtain repurchase of non-conforming loans.  The Guides provide that Residential (1) "may waive any default by" Terrace "only by a written waiver"; and (2) "is not required to demand repurchase within any particular period of time, and may elect not to require immediate repurchase," such that "any delay in making this demand does not constitute a waiver by [Residential] of any of its rights or remedies."  (E.g., Doc. No. 29, Ex. 6, § A209(B) & § A210(A), at RFC 06313-14.)[7]

---

[7]      In support of this affirmative defense, Terrace relies on Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc., 698 N.W.2d 449 (Minn. App. 2005) ("Because a nonwaiver clause may be modified by subsequent conduct, the mere presence of a nonwaiver clause does not automatically bar a waiver claim.").  But here, in contrast, the umbrella Contract provides that it "may not be amended or modified orally, and no provision of this Contract may be waived or amended except in writing signed by the party against whom enforcement is sought."  (Doc. No. 1-1.)  "However, by their terms,
                                                                                      continue...

Of the thirteen loans at issue, Terrace exercised its contractual right to "appeal" Residential's initial determination that Terrace must repurchase five of the loans, that is, the loans obtained by Almeida, Altemeyer, Wilson, and the two loans obtained by Sims. (Doc. No. 42, at 3.)  Regarding the remaining eight loans, Terrace did not seek any further review by Residential of its determination that Terrace must repurchase the loans. Furthermore, Terrace is unable to explain why it pursued appeals with respect to some of the repurchase demands but not with respect to others.  (Doc. No. 28, Ex. 1 (Shortridge Depo.) at 300.)

## (a)      The Unappealed Loans

As discussed above, the parties' agreement provides a means for Terrace to "appeal" any initial determination by Residential that Terrace must repurchase a particular loan.  Terrace's failure to take advantage of the contractually-provided procedure for Residential to reconsider its initial determinations precludes any right now

---

[7]...continue
the Guides may be amended or supplemented by Residential Funding from time to time." (Id.)  This suggests that while the Contract may be amended or modified, or a provision of it waived or amended, but only in writing, the Guides may be only "amended or supplemented," but provisions thereof not waived.  The Guides, however, then expressly provide that RFC "may waive any default by [Terrace] . . . *only by a written waiver* specifying the nature and terms of such waiver."  (Doc. No. 29, Ex. 6, § A209(B), at RFC 06313 (emphasis added).)  But even if this provision controls despite the terms of the umbrella Contract, Terrace identifies no such written waiver.  Nor does it argue that RFC waived *this* provision, that is, the limitation that any waiver be in writing.  And as the court recognized in Pollard, because "[w]aiver is a voluntary relinquishment of a known right," Terrace would have to "'provide evidence that'" Residential "'possessed both knowledge of the right in question and the intent to waive that right.'"  Id.  But Terrace identifies no evidence of any such intent.  And, of course, Terrace may not argue that any delay in enforcement itself constitutes such intent where the agreement requires that any waiver be in writing.

13

to challenge Residential's original determinations.   Accordingly, Residential is entitled to a judgment of liability with respect to the loans taken by Cabrera (two loans), Moore (two loans), Park, Perez (two loans), and Rizo.

### (b)    The Appealed Loans

With respect to the five loans for which Terrace did pursue an "appeal" of Residential's initial determination that the loans must be repurchased by Terrace, the Court ultimately comes to the same conclusion.  The fact that Terrace took advantage of the contractually-provided right to appeal an initial determination that Terrace must repurchase a particular loan does not permit it to now seek judicial review of the merits of Residential's initial or "appellate" determinations that the loans must be repurchased. The parties' agreement gave Residential the sole and essentially unreviewable authority to determine if a particular loan must be repurchased because it failed to meet the underwriting criteria provided in the Client Guides.

The agreement did provide for a right of appeal of an initial repurchase determination, but again, Residential–under the explicit contractual terms–had the "sole discretion" to "determine the validity of any appeal filed by [Terrace].  If [RFC's] decision remains firm following an appeal, [Terrace] shall repurchase the Loan and its servicing (if the Loan was sold servicing released)."  (Doc. No. 29, Ex. 6, § A210(H), at RFC 06318.)

In essence, Terrace agreed that Residential had the sole right to determine whether a loan must be repurchased, both initially and upon "appeal."  Terrace argues, however,

that Residential in effect waived any right to now seek enforcement of the agreement because it previously did not immediately and always enforce its rights under the agreement.  Craig Page, Terrace's President and principal owner, declares that, before the present dispute arose, "RFC rarely, if ever, demanded that Terrace repurchase loans, even when those loans may have violated purported representations and warranties in the Client Guide."  (Doc. No. 36, ¶ 4.)  Page further asserts that "[f]or years, RFC treated the provisions of the Client Guide as a 'guide' only, and did not insist that those 'guidelines' were a part of the parties' actual contract."  (Id.)

Even assuming this to be true, any such course of conduct by Residential does not undermine its contractual rights, which are indisputably clear in the parties' agreement. And one party's breach of a contract generally does not obligate the other party to immediately and always file suit to enforce the contract where the contract itself includes a non-waiver provision such as is the case here.  And Terrace freely concedes that during the time the parties maintained their business relationship, it chose to work out any repurchase issues amicably with Residential, but that it changed position once that relationship ended.  (Doc. No. 28, Ex. 1, at 109-10.)

Accordingly, the only issues regarding breach that must be decided by this Court are (1) whether Residential notified Terrace that an Event of Default had occurred such that the loan must be repurchased or Residential made whole, and (2) whether Terrace refused to comply with such a notification.  There is no dispute that Residential notified Terrace that it must repurchase the thirteen loans at issue.  (E.g., Doc. No. 4 (Answer), ¶

12 ("Defendant admits that Plaintiff has sent demand letters to Defendant alleging that certain loans that Defendant sold to Plaintiff had to be repurchased by Defendant."), ¶ 13 (same).)  Nor is there any genuine dispute, in light of this action, that Terrace did not comply with the notifications regarding the thirteen loans.

Nevertheless, Terrace asks this Court to review and evaluate whether there was, in fact, an Event of Default under the terms of the parties' agreement.  Terrace, however, may not contractually agree to give that authority solely to Residential and then seek to have this Court independently review the validity of Residential's determinations.  The Court's exercise of such authority to review Residential's determinations would deprive Residential of part of the benefit of the bargain it obtained from Terrace and for which Terrace was well compensated.

This result is not inequitable.  Terrace expressly acknowledged "that it has had the opportunity to obtain the advice of experienced counsel of it own choosing in connection with the negotiation and execution of the Client Contract and this Client Guide."  (Doc. No. 29, Ex. 6, § 103, at RFC 06277.)  Both parties are sophisticated business entities.  In fact, Terrace "acknowledge[d] that it is experienced with respect to the transactions contemplated by this Client Guide."  (Doc. No. 29, Ex. 6, § 103, at RFC 06277; accord Doc. No. 28, Ex. 1, at 137.)  The parties willingly agreed on the procedure by which Residential could unilaterally demand repurchase based solely on its determination that an Event of Default had occurred.  Residential paid Terrace a premium for the loans it purchased from Terrace under this agreement.  (Doc. No. 28, Ex. 1, at 76-77.)  In

exchange, Terrace took the risk of Residential determining that particular loans did not meet the stated criteria.  See SMFC Funding Corp. v. United Financial Mortgage Corp., 24 F. Supp. 2d 858, 862 (N.D. Ill. 1998) (explaining that where contract shifts risk to seller of non-conforming loans in exchange for seller being paid a premium, seller should bear the risk of a loan not meeting the contract's requirements).

Finally, Residential's exercise of its unilateral right to require Terrace to repurchase a particular loan simply rescinds that particular transaction, leaving the parties in the positions they occupied before Terrace sold the loan to Residential.  Terrace agreed that it bore the contractual obligation to ensure that the loans it sold to Residential met the underwriting requirements Residential had disclosed to Terrace in the Client Guides. (Doc. No. 1, Ex. A ("Seller/Servicer Contract"), at 8 ("[T]he Seller/Servicer makes the representations, warrants and covenants set forth in the Guides."); (Doc. No. 29, Ex. 6, § 203 ("The Client must ensure that Loans sold to [RFC] meet the eligibility and underwriting guidelines as outlined in the Client Guide.  [Terrace] represents and warrants such compliance."); id. ("[Terrace] is responsible for credit and property underwriting performed by it or by entities other than [Terrace] which have been retained by [Terrace] to perform such underwriting on [Terrace's] behalf."); id. § A200 ("[Terrace] acknowledges that [RFC] purchases Loans in reliance upon the accuracy and truth of [Terrace's] warranties and representations and upon the [Terrace's] compliance with the agreements, requirements, terms and conditions set forth in the Client Contract and this Client Guide."); id. § A202(A), at RFC 06296 ("Each of the Loans delivered and

sold to [RFC] meets the applicable program terms and criteria set forth in this Client

Guide."); id. § A202(B), at RFC 06296 ("[Terrace] is in compliance with, and has taken

all necessary action to ensure that each Loan is in compliance with all representations,

warranties and requirements contained in this Client Guide."); id. § A206, at RFC 06310

("[Terrace] should take all steps necessary to ensure that each Loan sold to [RFC] has

been prudently originated and underwritten, and that all information supplied by, on

behalf of, or concerning the Borrower is true, accurate and complete."); id. Ch. 3, at RFC

06324 ("Loans sold to [RFC] must conform to all requirements of this Client Guide."); id.

§ 401, at RFC 06394 ("The Client represents and warrants that all Loans sold to [RFC]

meet the eligibility and underwriting guidelines as set forth in this Client Guide.").)  If

Terrace was required to repurchase a loan for failing to meet the underwriting criteria, it

appears that it, in turn, could seek recourse from the originator.  (See Doc. No. 28, Ex. 1,

at 26-33 (explaining process by which Terrace underwrote loans originated by

independent brokers), 41-44 (same).)

        In any event, even if the contractual terms had *not* provided Residential with the

sole authority to determine if a loan must be repurchased, such that this Court could

appropriately review Residential's repurchase decisions, the Court does not agree that

Residential's determinations were not consistent with the Client Guides.  Residential has

supported its position with extensive documentary and testimonial evidence.

        Terrace, in contrast, conceded that it did not communicate "with any of the

borrowers."  (Doc. No. 28, Ex. 1 (Shortridge Depo.), at 185, 199.)  Nor did it contact any

of the original appraisers or the review appraisers.  (Id. at 178.)  In fact, it appears that

Terrace did little, if anything, to investigate the bases for repurchase that Residential cited

with respect to particular loans.  (Id. at 197, 235, 249, 255, 260, 273, 283, 284, 304, 311,

314-16, 317-18, 322.)

  With respect to the Almeida loan, Terrace bases its defense on the argument that

RFC waived its right to demand repurchase because RFC knew, "[s]hortly after the loan

was made," that Almeida, contrary to his loan application, did not intend to reside at the

property but rather to rent it out.  (Doc. No. 34, at 8.)  But Terrace premises this argument

on the allegation that Almeida told the *servicer* of the loan of his intent.  (Id.)  The loan

servicer, however, was not Residential, but Homecomings Financial, LLC.  And although

Terrace alleges that the two entities are affiliates, the fact remains that Residential and

Homecomings are separate legal entities.  (Doc. No. 35, Ex. 17 (RFC's R. 30b)(6) depo.),

at 10-15.)  Terrace provides no evidence that the knowledge of Homecomings was in fact

relayed to Residential or could be imputed to it.

  For the same reasons, Terrace's "prior breach" argument also fails.  Terrace

contends that Residential failed to meet its contractual obligation "to 'notify [Terrace] of

any material Loan deficiencies' after discovery of a deficiency."  (Doc. No. 34, at 10.)[8]

---

[8]  The Court first notes that Terrace may not contend that the purportedly "constantly changing" Guides that it claims RFC treated only as a "guide" rather than as a binding contract is therefore not binding on it, while simultaneously seeking enforcement–through the prior breach doctrine–of the obligations that the Guides imposed on RFC.  In addition, the provision on which Terrace relies pertains to a RFC "Underwriting Review":

continue...

Residential may not be deemed to have first breached the agreement by not notifying

Terrace of the problems with a loan where Residential is not the entity that had such

knowledge.

With respect to the Altemeyer loan, Terrace argues that RFC cannot prove that the

borrowers did not disclose certain debts in their loan application.  (Doc. No. 34, at 11.)

Terrace challenges both the admissibility of the publicly filed mortgage instruments on

which RFC relies and their relevance.  (Id.)  Terrace contends that the documents "only

show that, on the date of those instruments, the Altemeyers had granted a mortgage on

certain pieces of property to secure debts they owed," not either "the balance of the debts"

when they filled out the application or "that the prior loans were not released."  (Id.)

Thus, as Terrace tellingly contends, "it is possible that the loans" that Residential claims

were undisclosed had been paid off by the time they applied for the loan at issue.  (Id.)

The Court agrees with Residential that this argument is "unsupported speculation"

without any evidentiary support.  (Doc. No. 38, at 6.)  The mere possibility of such events

is insufficient to defeat Residential's summary judgment motion.

With respect to the Simms loans, Terrace contends that it cannot now be held

---

[8]...continue
[RFC] may perform, at its discretion, a quality control or underwriting
review of any Loan prior to or after [RFC] has funded the Loan. . . .

Upon completion of it review, [RFC] will notify [Terrace] of any material
Loan deficiencies.

(Doc. No. 29, Ex. 6, § 402, at RFC 06395.)  But it is not established that Residential
acquired such knowledge as part of any "Underwriting Review."

accountable for the claim that the original appraisals over-valued the two properties at issue.  (Doc. No. 34, at 21.)  Terrace does not object, however, to Residential's reliance on "review appraisals" in general.  As Residential notes, Terrace itself has relied upon them.  (Doc. No. 28, Ex. 1, at 263.)  And Terrace did not contact RFC's review appraiser when RFC demanded that Terrace repurchase the loan in question.  (Doc. No. 28, Ex. 1, at 178, 306.)   Rather, Terrace takes issue with the alleged deficiencies of the particular review appraiser at issue here.  Terrace challenges the testimony of the person who conducted the review appraisal for RFC on several grounds: (1) that she is an expert paid by RFC, (2) that it is her practice when conducting review appraisals to assume a problem with the original appraisal, (3) that she did not personally observe the interiors of the properties, and (4) that she did not spend sufficient time evaluating one of the properties. (Doc. No. 34, at 21-23 (relying on appraiser's deposition testimony).)

This Court's review of the transcript of her deposition discloses, however, nothing upon which a reasonable jury could dispute her appraisal.  She is a professional appraiser assigned by an appraisal firm–and paid by that firm–and does not know the arrangement between that firm and RFC.  Her practice of assuming a problem with the original appraisal is neither surprising nor suspicious in light of the nature of a "review appraisal." Terrace does not establish that the fact that she did not personally observe the interiors of the properties undermines her conclusions.  And nothing suggests that the time spent evaluating the second property was inadequate, particularly in light of the fact that her appraisal of the property's value matched her earlier appraisal of the property exactly.  In

short, Terrace does not provide any evidence that her review appraisal of the property

was, in fact, erroneous.

Terrace also contends that RFC failed "to ensure that the foreclosure sales on the

Sims loans were confirmed pursuant to Georgia law," thereby precluding the ability to

recover the balance owed on both loans.  (Doc. No. 34, at 23.)  Terrace further contends

that "RFC did not demand that Terrace repurchase the Sims loan until May of 2009, <u>after</u>

the foreclosure sales."  (<u>Id.</u> (emphasis in original).)  Terrace thus argues that Residential

has waived, or is estopped from pursuing, any right to demand repurchase of the loan.

(<u>Id.</u> at 23-24.)

But RFC's contractual remedies include requiring Terrace to either (1) repurchase

the loan, if the loan is still outstanding, or (2) "make whole" Residential for its losses, if

the property has been foreclosed on.  Insofar as Terrace is arguing that RFC demanded

that Terrace actually repurchase a loan after foreclosure, the demand letters both request

that Terrace make RFC whole.  (Doc. No. 32, Ex. 5, Doc. No. 33, Ex. 1.)  Insofar as

Terrace is contending that RFC failed, by not complying with local law, to preserve the

ability to recover any outstanding balance, Terrace identifies nothing in the agreement

obligating RFC to do so.[9]  Finally, RFC was not directly involved in many, if not most of

---

[9]       The parties' agreement provides a formula for computing the repurchase
price.  (Doc. No. 29, Ex. 6, § A210(B), at RFC 06315.)  It also provides that RFC "may
demand that [Terrace] repurchase, and [Terrace] must repurchase, a Loan after
foreclosure even if the full amount of its outstanding debt was bid on by or on behalf of
the Loan's owner to acquire the **Mortgaged Premises** at the foreclosure sale.  In the
event [Terrace] is obligated to repurchase a Loan after foreclosure, the repurchase price
shall be calculated using the formula above, however **Scheduled Principal Balance** shall
continue...

the foreclosures, including that on the Sims' loans, because foreclosures, short sales, and note sales were handled by MERS and / or the loan servicer. (Doc. No. 35, Ex. 7, at 90-91, 107, 110, 126.) As RFC's corporate deponent explained, any questions about seeking confirmation of such foreclosure sales would have to be directed to the servicer. (Id. at 140.)

With respect to the Wilson loan, Terrace argues that because it was a "stated income" loan, Terrace may not may held accountable for any misinformation Wilson provided about her income, particularly in light of her credit score. (Doc. No. 34, at 24.)[10] But the agreement provides that, with respect to stated income loans, the required documentation "is for Borrowers with established income source(s) and employment history." (Doc. No. 29, Ex. 9, § 433, at RFC 06429.) Because "[e]mployment stability is a critical component in evaluating the Borrower's continuing ability to meet obligations," wage earners "must have a two year history of employment in the same business or line of work," and that self-employed borrowers "must have at least two consecutive years of self-employment in the same business entity." (Id.) Here, Residential contends, "Wilson also misrepresented her employment" because while the application indicated she had

---

[9]...continue
be substituted for the actual principal balance." (Id. (emphases in the original).) Insofar as Terrace might be unable to recover any outstanding balance, that appears to be a risk to which they agreed.

[10]     Terrace also relies on its waiver argument, that "RFC had not ever made a repurchase demand to Terrace on such 'stated income' loans" before the collapse of the real estate market. (Id. at 24.) But this Court has already ruled that Terrace can not meet its burden with respect to that affirmative defense.

worked for two years at the cleaning business she started, that business had been

operational only for about one year at the time of her application.  (Doc. No. 24, at 10.)

The Court notes that the basis for RFC demanding repurchase was apparently

confined to the determination of an "income misrepresentation," that is, the fact that the

application indicated that the "borrower is a self-employed owner of Tammies' Cleaning

with a monthly income of $6,000," while her bankruptcy filing "reflect[s] a monthly

income of $445.  (Doc. No. 33, Ex. 55 (April 10, 2007 repurchase demand letter).)

Terrace contends that "an RFC employee agreed that Ms. Wilson's subsequent statement

in a bankruptcy filing that her income was substantially less than what she stated in her

loan application did not make sense."  (Doc. No. 34, at 24.)  However, regardless of

whether her claimed amount of monthly income was a sufficient basis on which to

premise breach, Wilson's deposition discloses numerous red flags regarding her income,

employment history, and debts, each of which could serve as a valid basis for a demand

for repurchase.

In sum, RFC is entitled to summary judgment with respect to the eight loans for

which Terrace did not pursue an appeal of RFC's repurchase demands, and the five loans

for which Terrace did pursue an appeal.

## 2.    Damages

Having concluded that Terrace must repurchase the thirteen loans at issue, the

Court turns to the issue of Residential's damages.  Residential has supported its position

with extensive documentary and other evidence.[11]  Terrace, in fact, admits that

Residential's damages calculations were "standard" within the industry.  (Doc. No. 28,

Ex. 1, at 162.)

Terrace, however, again argues only that Residential has failed to prove its case,

largely because the documents on which it relies are hearsay and not business records.

(Doc. No. 34, at 5-8.)  Terrace contends that "RFC relies exclusively on the affidavits" of

two individuals "who are not RFC employees," but rather employed by GMAC

Mortgage, LLC, an entity affiliated with RFC.  (Id. at 5 & n.2.)  Terrace also contends

that the documents on which RFC relies "are not the business records that documented

the damages or charges RFC alleges it has incurred," but rather documents that "purport

to summarize information gathered from other documents."  (Id. at 5-6.)  Terrace argues

that RFC's documents are inadmissible unless RFC can establish that they were made in

the regular course of business so as to comply with the business records exception to the

hearsay rule.  (Id. at 6.)  But Terrace contends RFC can not satisfy the requirements of the

business records exception because the documents were made within the past year, not at

or near the time of the event purportedly recorded.  It also argues that the two individuals

who created the documents lacked any personal knowledge of the information recorded in

those documents because they "both admit that they reviewed other documents or

---

[11]       In conjunction with its reply, Residential filed a supplemental affidavit of
John Larson.  By letter to the Court, Terrace objected to the affidavit, contending that it
was "new evidence" that violates Rule 6, which requires that "'[a]ny affidavit supporting
a motion must be served with the motion.'"  (Doc. No. 40 (quoting Fed. R. Civ. P. 6).)
But this Court permitted Terrace to file a sur-reply addressing that affidavit and any other
matters Terrace objected to as having been first raised by Residential in its reply.

computer systems to either prepare the" documents or confirm their accuracy.

One of the individuals at issue, John Larson, is a repurchase risk analyst for GMAC Mortgage, LLC.  (Doc. No. 26, ¶ 1.)  "RFC's repurchase operations are now overseen by [GMAC Mortgage]."  (Id. ¶ 2.)  Thus, it appears that while RFC and GMAC Mortgage remain existing and affiliated entities, GMAC Mortgage is now the *de facto* successor of RFC with respect to this particular aspect of the business and the appropriate entity to now calculate RFC's damages.

In any event, Larson stated, in his sworn affidavit, that he has "direct access to RFC accounting business records necessary to verify repurchase, indemnity and make whole losses for RFC" and "direct access to services business records."  (Id. ¶ 4.)  Larson explains that his predecessor originally computed eleven of the thirteen damages calculations and he computed the remaining two, as well as having "updated and verified the damages calculations using the RFC and servicer business records directly available to" him.  (Id. ¶ 5.)  In making the calculations at issue, he had "computer access to information and business records made available directly by loan servicers" and considers "these systems and the business records directly communicated to [him] reliable in calculating" the damages.  (Id.)

As he further explained in his supplemental affidavit, "[a]ll of these records were made at or near the time of the occurrence of the underlying matter," either by his predecessor or by himself.  (Doc. No. 39, ¶ 2.)  Because RFC employees no longer calculate damages, it is presently solely his function to calculate damages.  (Id. ¶ 3.)  The

calculations were kept by his predecessor in the course of regularly conducted business

activity, and are now so kept by him "at [GMAC Mortgage] on behalf of RFC."  (<u>Id.</u> ¶ 4.)

Accordingly, the Court rejects Terrace's hearsay and other evidentiary objections

to the documents supporting RFC's damages.

### C.    Indemnity Claim

In Count II of the Complaint, Residential asserts a claim for contractual

indemnification.  The parties' agreement provided that Terrace "shall indemnify [RFC]

from all losses, damages, penalties, fines, forfeitures, courts costs and reasonable

attorneys' fees, judgments, and any other costs, fees and expenses resulting from any

**<u>Event of Default</u>**."  (Doc. No. 29, Ex. 6, § A212, at RFC 06320.)  "In addition, [Terrace]

shall indemnify [RFC] against any and all losses, damages, penalties, fines, forfeitures,

judgments, and any other costs, fees and expenses (including court costs and reasonable

attorneys' fees) incurred by [RFC] in connection with any litigation or governmental

proceeding that alleges any violation of . . . law by [Terrace] . . . in connection with the

origination or servicing of a Loan."  (<u>Id.</u>)  Finally, Terrace "also shall indemnify [RFC]

and hold it harmless against all court costs, attorneys' fees and any other costs, fees and

expenses incurred by [RFC] in enforcing the Client Contract."  (<u>Id.</u>)

Here, Residential seeks the attorneys' fees and costs it has incurred in this action.

(Doc. No. 24, at 22-23.)  Terrace, apparently resting its strategy entirely on its argument

that it is not liable for breach under Count I, does not expressly oppose Count II.

Residential shall, as it has proposed, submit an affidavit setting forth such expenses.

**III.    ORDER**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiff's motion for summary judgment [Doc. No. 22] is **GRANTED**;

2.    Plaintiff shall file within twenty days of the date of this Order an affidavit

detailing the attorneys' fees and costs it seeks to recover under Count II; and

3.    Defendant may file any response within ten days thereafter.


Dated:   February 7, 2012                      _s/ Susan Richard Nelson_
                                               SUSAN RICHARD NELSON
                                               United States District Judge